Good morning, Your Honor. I'm Janice Mazur, appearing for the Appellant SEMEX Corporation. I'm here with Attorney Scott Schaffner and Brooke Lever as well. In this case, Appellant makes two separate contentions, either one of which would defeat the statute of limitations defense asserted by the insurer. First, Appellant contends that Federal is stopped from asserting the two-year contractual and statutory statutes of limitations on the basis of its conduct in not only failing to disclose but affirmatively concealing its own experts and forensic accountants' undisputed findings after a six-month investigation into the value of the losses, and then, after hiding that information, making an offer that was well below the amount of the undisputed covered losses. Federal very narrowly argues from, I think, high atop a tightrope that there is no case or statute that explicitly says, insurance company, you have to disclose a preliminary report to your insured. But what Federal does, I think, is ignore a very large body of long-established case law that requires all insurers to have a heightened duty to their insured to their insurers and to deal fairly with them. Some of the ---- That's why we have a cause of action for the breach of the covenant of good faith and fair dealing, which itself has a two-year statute of limitations. If you want to say that whenever the duty is breached, that suspends the statute of limitations, that makes mincemeat of the two-year statute. Well, it doesn't. That's your problem. Well, I don't think that it does, Your Honor, because I think that if you look at the elements of what a equitable estoppel are, one of them is that the person who is being estopped or who is thought to be estopped has ---- relies on ---- he must intend that his conduct be acted upon, and the party who is asserting the estoppel has a right to rely on that conduct. And I think that's exactly what we have here. In this case, the insurer intended that its offer of $1.8 million, which is $300,000 less than what the undisputed covered losses were, it purposely hid the true value so that the insurer would have no choice but to rely on their belief. But no problem. No problem in hiding the true value unless there was a duty to disclose. And I contend that there certainly wasn't a duty to disclose. And that duty to disclose comes from? It comes from all of the case law and the insurance regulations that say, for example, estoppel may arise from the silence where there's a duty to speak, and the duty to speak ---- But the duty is what we're talking about. There has to be a duty to speak, and that's the problem. Well, I believe that there is a duty to speak because the insurance ---- first off, the insurance company has an obligation to refrain from injuring the rights of the others to receive benefits. It's got a policy, it's got a contract that says we're going to pay the full amount of your losses up to the limitations. And if it purposely hides what the value of the losses are in a very complex damage situation where it took 6 months and $30,000 to establish what those losses were, then it certainly is not refraining from injuring the rights, the established rights, of its insurers. That's why they have 2 years to sue them. But they didn't know until 4 years later or 3 years later that they had been lied to. That's your problem. If the failures of the scrolls and the breach of the duty becomes itself a way of suspending the statute of limitations, then you don't have a statute of limitations for breach of the covenant of good faith and fair dealing. It's ---- that's your problem. I have some difficulty with the other part of the case. I mean, this is not some unknown fact or some unknown set of circumstances. This is a knowledge about your own client's business losses. Who is in a better position to know exactly what your client suffered by way of business losses than your client itself? Well, our client is not a forensic accountant, Your Honor, and I think if it took a forensic accountant together with an expert 6 months to determine what the losses were, then certainly the client, who is a corporation who is engaged in industrial products, would not necessarily understand or know, be able to tell what their damages were. They provide all the information. They provided the raw data, and the forensic accountant had to establish it. And if it was easy, I don't think that there would be any issue here. I mean, if this was just a question of them bringing the bill for the car repair and saying, well, it's going to cost me $2,000 to get this repaired, here's the bill, that's easy. But when you have a situation where you have a very complex situation in terms of what the damages were and how to assess them, and it takes the knowledge of experts months and months and months to determine, then I don't think that that's a burden that should be put upon the insured. And even if ---- Nobody prevented the insured from doing its own calculation. But why should the insured have to do its ---- I guess the insured could have gone out and hired its own forensic accountant, but isn't that something that the insurance company is supposed to provide to them? And if the insurance company is providing that to them, do they have a right to then hide the ball and say, well, we're not going to tell you what it is, and saying it would be inappropriate for us to disclose this to you? I think the fatal flaw in CEMEX's or in Federal's position is that they're treating this as if it's an adversarial situation. This is not litigation where you get to hide your information from the other guy. They have a heightened duty. We're looking at estoppel, right, the barriers. Right. And one of the prongs is reliance and access to the information. And, you know, that is wholly aside from the question of whether they have no evidence. And I just find it hard to figure out how you meet that prong when your client provided all the information to the insurance company. But my client provided raw data and did not have a means, did not have the education even to ---- Could have hired an expert if they really needed to. But they didn't believe they needed to because they believed that they were working fully cooperating with the expert that was provided by the insurance company. The insurer, I think one of the key basic principles of bad-faith law or good-faith law ---- That may be true. They may not have thought they needed to, but that doesn't change the fact that they had access to the information. And, well, but then once they found out, months down the line, that the insurance company was going to ---- A lot of it they could have done. They could have said we won't settle. Right. But they were financially strapped. And the insurance company took advantage of that. First off, part of the reason they were financially strapped is because the insurance company wrongfully failed to defend the third-party claims. So in addition to suffering this catastrophic sales loss, they were also defending to the tune of hundreds of thousands of dollars a third-party claim that the insurance company should have picked up. And it eventually did, but way after they had incurred all this. The insurance company was expressly told that they were financially in a devastated situation and were desperate for cash. The insurance company played on that and said, hey, we know they don't have much  money. Maybe we can low-ball them and offer $300,000 less. I don't think there's any way in the world that anybody can look at that and say that that's good faith and that complies with ---- They could have gone to court and sought disclosure. They could have gone to security court. But they didn't know until the last minute. I mean, they asked several times. It wasn't until the forensic accountant's report was completed and they kept asking for it, and the insurance company says, well, no, we're just not going to give that to you. And at that point, they're hanging on by a thread. Well, sir, what at that point prevented them from going to court and seeking to compel disclosure? If there was, in fact, a duty under California law to disclose, this is something that would have easily been established by going to court. But California case law holds that an insurer has a right to rely on the good faith of its insurer. So if the insurer is saying, here, I'm offering you this money. This is a fair settlement. And they have no way to do it. And what they're going to have to do is go to court and fight a third battle now by forcing the disclosure in court when they're already defending a third-party claim and they're already arguing with the insurance company. It seems to me that this is well beyond the heightened duties of good faith that that insurance company has. An insurer must give at least as much consideration to the welfare of its insurer as to its own interests. And that's the California Supreme Court. In the Egan case, the Limandri and the McAuley case say that the duty to disclose material facts which are not accessible to the insurer, and in this case, I don't think they're realistically accessible to the insurer. It doesn't even require a heightened duty. But in this case, we do have a heightened relationship. Kennedy. Well, I'm down to 43 seconds. Pardon me? You're down to 40 seconds. Oh. Well, let me move on really quickly to the next issue. I thought you were dividing time. Oh, no. I don't know what you said in the beginning. You're not dividing time. I would like to retain a few minutes for rebuttal if that's possible. You haven't got minutes. You've got seconds. Okay. Seconds. Okay. Going to the second issue, then. The limitations period should be told pending the resolution of the third-party claim. The Lambert case, California Supreme case, holds that this is true for third-party claims, that the statute of limitations will be told or can be told pending the outcome of the claim. Although this is a first-party claim, the same policy considerations, I think, apply. The rationale of the Lambert case, which has recently been expanded in the case that I cited to the Court in my supplemental authorities last week, states that the purpose of an insurance policy is peace of mind and security and the protection would ring hollow if the insured had to simultaneously enforce its rights under the policy and defend its claim. And justice and fairness require that there be an equitable tolling of the limitations period. This has recently been extended under the new case, which is called Lambert. These are separate claims. One of them was for business losses. Another one was for third-party liability. Pardon me? These are separate claims. Well, they're separate claims, but the same policy considerations apply. We've got one policy. We've got two first- and third-party claims both going on at the same time, both at the same start date as far as their statute of limitations. But they have no connection to each other. Well, I believe that they do because the they've got the same the same grim result as the words that were used by the Lambert Court would result if they were going to have to fight two battles, two fronts at the same time and have two widely different limitations period. Moreover, in this case, we've got the added compelling facts, I think, that they ended up, both parties, CEMEX and Federal, ended up basically on the same side being co-parties in an action against another third party who may have been responsible for the action in the first place. There's potential conflicts there. And also we have California's rule against splitting causes of action. Basically what we've got is a breach of contract action for both the first and the third party claims. And if they brought one, they would have to bring the other. Or if they deferred one, then they would run the risk of losing that one if waiting while the third party claim was told. So I think that there was an inherent conflict, an inherent problem in not being able to split their causes of action. And the Lambert case, I think the rationale, even though it was a first-party case, or a third-party case, applies equally here. And in the new. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Anne Gazarian is on behalf of Defendant Federal Insurance Company. I'd like to start out by reemphasizing the fact that this is a first-party case, a first-party case or claim arising out of a commercial business policy interruption that resulted in a settlement, in a settlement that was initiated by Senex, the plaintiff in this case. Now, Ms. Mazur mentions that it took six months to resolve and settle the first-party business interruption claim. That is true. And it wasn't due to any neglect or delay on behalf of Federal. What happened was, and it was a complicated business interruption claim, but they were trying to get the raw data, the documentation, the business records from Senex. And it took some time. And that's why you see, as supported in the record, that there was a third preliminary report. Federal had requested production records. They wanted production records to see if their numbers were correct. Yes, they retained a forensic accountant. Now, again, as the Court did acknowledge, that this was Senex's own business records, their own data. This is not a small company. This is a large multimillion-dollar company that has controllers, that has accountants. And certainly if they wanted to go outside and retain an accountant, they could have. The problem is that counsel and Senex ignores the fact that they were aware that there was a report out there. They were aware that this report had obviously certain calculations, and sure, the forensic accountant gathers the data, and they use different methods, accountants use different methods, and Federal and their expert came up with a number. We did not disclose it because it was a preliminary report. And if you look at the exhibit, I'm sorry, the record, it clearly states on the face of the report that it is preliminary. In portions of the body of the report, and I believe it's at page 79 of the record that it says, if there is a chance that the report has been released to Senex, that they would not have settled for 1.8. I'm sorry, I didn't hear you. It's likely that if Federal had released the report, they should have been completely above board about all the information they had, that they were acting on, that Senex would not have settled for 1.8. Well, I think that calls for speculation, but I'm not sure that's necessarily true, Your Honor. The reason why I say that, they were very eager to settle, and I don't think, we didn't twist their arms, there wasn't any coercion, but they did want to wrap this up, and again, you know, these numbers, it's a matter of interpretation. You can get two different accountants in the same room, and they will disagree as to what the loss is. Obviously, it's dependent on sales, the market. You know, there was a downturn in the economy. So obviously, it is not a precise science or number, and it could have, if we had continued on with our investigation and correlated the production records with the sales losses, or perhaps did some further investigation, there was discussion in the record that an engineer was going to be retained, that number could have went down, and they would, you know, and it could have went down just as it could have went up, and that's why everybody, every party took a risk in settling. There's no doubt, though, about the fact that the insurance company had more information in making this decision than did the client, than did the insurer. They had the opinion, could have narrowed it or beat, possibly would go up or down, but they did have this opinion of this third-party expert who seemed to think the claim was worth $300,000 more than it was actually settled for. And this was information. This was a relevant fact that would have made a difference in the negotiations. It's quite clear Federal didn't release it because they didn't want, they should, to take advantage of this information. I mean, if it was just a matter of, gee, this is uncertain, we can communicate that and say this is uncertain, this is tentative, take it for what it's worth, we're not bound by it, right? But disclose it, right? They obviously were trying to gain an advantage by keeping this information to themselves and settling the case while having this information, not sharing it with the insurer. I respectfully disagree. I don't think that was Federal's motivation here. I don't think they wanted to gain an unfair advantage. I believe and I think that they ---- Maybe they wanted to gain what they thought was a fair advantage. But is there any doubt that they were trying to gain an advantage? I really don't look at it as an advantage. I think that reasonable minds will differ as to a value of a claim. I'm sure that if it had been a disadvantage, they would have shared it gladly. Yeah, I believe they would have acted the same way, whether the number was lower or higher, if they are in the process of truly investigating. And here this isn't them just saying ---- Let's say the account had come in at 1-5 and they offered 1-8, they would have said, oh, but we're not going to let you have this accounting support, which actually comes out less than we're offering you. You know, you have to have a pretty straight face to say that. And I think ---- I'm really being genuine here. I wouldn't go there if I were you because it undermines your credibility. I will not. I mean, the simple fact is that the report was unfavorable to the insurance company's position. And every inference you can draw from this, of course, these are questions to be resolved at trial if it matters. But the reason they don't provide this information to the insurance is because they want to buffalo them into entering a settlement that's more favorable to the insurance company. They knew it would not help the insurance company's position in getting an insurance company to settle for what they wanted to settle for. I don't think rational, any other rational inference can be drawn from these facts. Okay. And again, I would respectfully say that I believe, and I'm not being ---- I hope I'm not being naive, but I believe that because there was investigation and they wanted production records, and yes, I'm not going to argue that certainly the number was higher than what they settled for, no doubt. And, you know, that happens to be the case. But they were investigating, so they ---- It doesn't just happen to be the case. It doesn't just happen to be the case. It was the case, and given that it was the case, they had a financial interest in not disclosing it. It was a financial interest adverse to the insurance. You know, you can try to package it some other way, but in my book, you lose credibility by doing that. I mean, they either, you know, if they weren't trying to keep it, and they don't do these clothes, or you have a barber's station, you might win on that ground. But don't try to sit here persuading us that they were good guys, and they were doing, you know, they were acting the way you or I or anybody else would expect somebody to act if they had our interest at heart. It's not how your mother would act, you know what I mean? It's not the way you expect your lawyer to act. It's not the way you expect your trustee to act. In fact, it's not the way you expect the insurance company to act. I mean, it's insured. I think we need to take that as a given. Otherwise, we're kidding ourselves. And, again, you're going to lose a great deal of credibility with me. And if I can go on a little further. Why don't you explain to us why your client was entitled to hide the green weenie here? Well, I would say that in Judge Hayes' district court, in our briefs, and reviewing the regulations cited by appellants, there is no obligation on the part of an insurer to turn over a preliminary report. Now, why? What about the duty to deal fairly with insurers and to put the insurer's interest on the same level as one's own? Isn't that a duty in California law? Absolutely, Your Honor. And how do you then put the insurer's interest on the level of your own when you act from information that you know the other side, your client, would like to have or find useful to have, and you choose to not disclose it in order to get a better deal out of it? Well, I agree that there is that duty. I don't think it was violated here in this case. You're going to try to kid me again. The documentation, the raw data was available to the insurer. It was their numbers. So I don't think we're hiding the ball. Again, it was preliminary report, Your Honor. You know, think carefully about what you're saying because, you know, you don't have to go there and you're just digging your own grave. They had an opinion of a third-party expert that said this claim was worth $300,000 more than the settlement before. The raw data may have been there, but as you know, and if you look in the mirror in the morning, you will realize that what I'm telling you is the truth, and tell this to yourself. Having a third-party expert report that comes up with a figure that is unfavorable to you is the kind of information you keep from an adversary. You don't just say, oh, well, you've got all the raw data, and this is just an expert's report. If you can keep that away from an adversary, that's what you do. But an insured is not an adversary. An insured is somebody with whom the insurance company has a fiduciary relationship or something of that sort. And painful though it may be that you won't have this information that you much hate to have the insured have be given to them, doesn't the insurance company, in fact, have exactly that duty? Because that's fact. The fact that a third-party comes in, does an audit, comes up with a figure and supports the insured's claim, winds up being something the insured can use. Isn't that report, in fact, part of what the insured pays for when paying premiums? One of the things you pay for in buying insurance is an assessment of the loss. You know all those earthquake cases, right? Oh, yes, I'm very familiar. You're familiar with earthquake cases, but the California Supreme Court said it's part of what you pay for. Part of what you pay for when you buy insurance is somebody to come in and tell you how much you lost. I mean, if your house gets into an earthquake, as some of us have in Los Angeles area, or many people did, you don't know what the loss is. You don't even know sometimes that there is a loss. You don't know whether the foundation has been undermined, or whether there's been cracked, or whether there's been subsidence, or, you know, God knows all those things that have to do with earthquake losses. And so the insurance company comes in, hires an expert, the expert says, yeah, you know, there's great subsidence, there's a cracked foundation, all that. Insurance company gets the report and says, we're not responsible. Didn't the California Supreme Court say part of what you pay for, and didn't this Court say in those cases, that part of what you pay for as an insured is an assessment of the losses? That's part of what you pay for in premiums. Yes, and I'm going to ---- Okay, so if that is the case, why isn't that something that the insurance company was required by law in California to turn over to the insured because they owned it? They paid for it. They owned it. Yes, and unlike the earthquake claims, and I'm not trying to minimize this claim, but in an earthquake claim where you don't know whether the foundation or the house is faulty and the extent of damages, you have to get an appraiser. And appraisers come in, maybe foundation people, structural people, and in this case, the insured obviously did a balance sheet. They did their profit and losses. They have the data. And so here ---- That's your argument? No, no, no. But I'd like to ---- Not like earthquake? No. Because you know your losses from the large business. How about if it is a medical problem? Do you say, oh, well, you know, it's your pancreas, and therefore you don't need a medical report for that because, you know, it's your pancreas. You have the symptoms. Well, I would think the situation is a little different with the pancreas. But if I may just, you know, exhibit the record at 64, explains what the insurance company was thinking when they made that settlement offer, and actually it was the demand of CEMEX for the 1.8, but when they received that demand, the justice, Mr. Copeland ---- They probably did high-fives. They said, boy, boy, we better make sure that they don't get that report because they managed to low-bar them for 1.8. Your Honor, at page 64 of the record, it says, and this is an e-mail to a supervisor at Chubb at Federal, you will recall that I asked the insured back in early September to give us production information that would allow us to cross-check the loss of production with the claimed loss of sales. This was just to give us a reality check on the lost sales figures. Per our conversation of the other day, the insured has not supplied this information. We thus don't have a reality check on Cornwell's numbers. However, the insured is willing to settle. You know what we have here in front of the courthouse? What we have? I'm sorry? You know what we have in front of the courthouse? Steps. I suggest you go out there and settle this case. You don't want this opinion. Okay? Thank you. You got it? Would you like us to defer submission for a week to give counsel an opportunity to consider settlement? I have to confirm with my client. I would like to submit the matter right now. And we will certainly take your owner's advice. You go talk to them. The way your client has dealt in this case is shameful. And whether you lose, you can be sure I'll say something that's not going to be kind to the way your client. I personally will make sure that something is said that casts aspersions on the conduct in this case. And don't count on winning. I don't know how my colleagues feel about it, but you haven't got my vote. You sure you don't want a week to defer submission? I can be very swift. Can we have a few minutes? Yeah, sure. We'll take the next case. You can come back and tell me. Thank you. You could settle it right now, by the way, but you go back and talk to your client or whoever. Okay. Your Honor, I have conferred with my client and my client agrees to suspending the decision for a week, so we can see if we can resolve the matter. This is just for the record. This is Ms. Gazarian. Yes, I'm sorry. Yes. Because we've interrupted the case. I understand. Yes. People listening to the tape won't necessarily know who's talking. Yes, sitting on Gazarian's. Thank you. Okay. Thank you very much. It's the next concursion. Okay. And that was Ms. Mazur. And I think she said concurs, in case it doesn't. Okay. On stipulation of the parties, we will defer submission for a week. If counsel, we will issue an order to this effect, but what we'll say is if counsel needs additional time, they can notify us. And if, you know, reasonable extensions, so long as negotiations are going forward in good faith, we will continue suspensions. If we don't hear from counsel, we'll submit the case and decide it. If counsel would like the offices of our circuit mediators, they are very good. They are very, very good, and they have had successes in bringing parties together that were thought to be unsettlable, including criminal cases, one death penalty case. I thought it was amazing. So I highly recommend them. If you would like to have that, talk to our deputy clerk, and he will give you the information on how to get a hold of the circuit mediators. Thank you. Okay. Thank you, counsel. Thank you. Appreciate your. If you do resolve the case, we should hold up the court meeting. Of course. Thank you, counsel. Thank you very much. Okay. We'll now. Go ahead. We'll now hear argument in New Hampshire Insurance Company v. SEMWA.
judges: Kozinski, Rawlinson, Cedarbaum